IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Emily Doe, | ) | Civil Action No.: |
| Plaintiff | ) | |
| vs. | ) | |
| | ) | |
| American University of Antigua, Inc., | ) | **COMPLAINT** |
| | ) | (Jury Trial demanded) |
| Defendant. | ) | |
| | ) | |

Emily Doe[1] (hereafter "Emily") files this action for breach of contract and unfair trade practices against American University of Antigua Inc. and seeks relief as set forth below.  In support of her action and claim for relief, Emily would show:

1. Emily is a citizen and resident of Horry County, South Carolina.  She is a 4th year student in the medical degree program at American University of Antigua Inc.

2. On information and belief, American University of Antigua Inc. (hereafter "AUA") is a Florida corporation with multiple connections to the State of South Carolina sufficient to establish personal jurisdiction in this court.  AUA entered into a contract with Emily and has breached that contract, causing Emily damages set forth herein.  In addition, AUA has partnered with health institutions in South Carolina for purposes of providing rotation in various fields of medicine as part of the medical school curriculum for its medical students.

3. On information and belief, Manipal Education Americas LLC (hereafter "Manipal") is a New York corporation which serves as agent for AUA in the United States through its association

---

[1] Emily brings this action using a pseudonym surname ("Doe") in order to protect the confidentiality of the internal grievance process to which she was subjected by the Defendant, and also to minimize harm to her reputation as a future medical doctor when she eventually completes her medical school education.  She requests permission to proceed using this pseudonym throughout these proceedings.

with Manipal Global Education Services.  While not named as a separate party, acts and omissions by Manipal may form the genesis of certain breach of contract by AUA.

4.    On information and belief, among other things, Manipal serves as an agent for AUA and its students in arranging clinical rotations at healthcare facilities in the United States that are affiliated with AUA, and to initiate contract agreements with facilities that are not then-currently affiliated with AUA but who agree to provide rotation service for AUA students. While Manipal is not a named party to the contract between Emily and AUA, it has operated as an agent for AUA, and as a principal in other respects, and to the extent it participated in creating the documentation which forms the basis of the contract between the parties and vesting contractual rights in Emily to enforce against AUA.

5.    Jurisdiction is appropriate in this Court pursuant to 28 U.S. Code § 1332(a)(1) (diversity jurisdiction) in that the parties are citizens of different states and the amount in controversy exceeds $75,000.00.

## TERMS OF THE CONTRACT BETWEEN THE PARTIES

6.    Each and every allegation set forth above is incorporated herein where relevant as if repeated herein verbatim.

7.    AUA is a private, for-profit corporation which operates a Medical School in Antigua which, on information and belief, is currently accredited by the Caribbean Accreditation Authority for Education in Medicine and Other Health Professions (hereafter "CAAM-HP").

8.    On information and belief, AUA was established and is operated with the United States medical educational model in mind.

9.  AUA is affiliated with Florida International University (FIU) which provides clinical sites in the United States for AUA's students to undertake core rotations in United States public and private institutions.

10. AUA is a member of Manipal Global Education Services, whose United States affiliate, Manipal, provides academic services, and provides marketing to prospective students to boost enrollment and student retention. On information and belief, Manipal is the agent for admission of students to AUA and provides "packages which take care of the entire student life cycle" for students at AUA. It is also believed to operate critical aspects of AUA's curriculum, grading and management process.

    https://manipalglobal.com/mage/services/marketing-and-enrolment.html

11. On information and belief, Manipal provides faculty support and assistance in meeting specific academic requirements for its member schools, and provides "customized program and course design and development" to take "non-core academic activities off your back, thereby enabling you to focus on your core competencies."

     https://manipalglobal.com/mage/services/academic-services.html. On information and belief, Manipal may have assisted in designing the student handbook and other guidelines which formed the basis of the contract between Emily and AUA and facilitating the implementation of the student grievance proceeding.

12. In 2015, relying largely on the marketing program for AUA which promised a quality medical education and opportunities for clinical rotations, internships and residencies through existing partnerships with public and private health care facilities in the United States, Emily applied for admission to AUA for purposes of contracting with AUA to carry out the

necessary educational undertakings to obtain a medical degree from AUA and enrich her medical education through partnership with quality medical institutions in the United States.

13. Emily was accepted as a student at AUA and began her first year as a student at AUA in Fall, 2016 when she undertook and satisfactorily completed the Basic Science Division Courses Human Structure and Function I, Molecular Basis of Medicine I, Introduction to Clinical Medicine I, and Mind Brain Behavior I courses.

14. When Emily enrolled at AUA, the Student Handbook and other documentation issued to her by AUA spelled out the terms of the contract between Emily and AUA.  AUA amended its contract with Emily as she progressed through the education process (without additional consideration), unilaterally issuing additional contract provisions which purported to govern clinical rotations at affiliated facilities at which students of AUA can perform rotations in various fields of medicine prior to receiving their medical education degree.

15. Additionally, the accreditation of AUA by the Caribbean Accreditation Authority for Education in Medicine and Other Health Professions (hereafter "CAAM-HP") required AUA to supply Emily with the academic and student support it agreed to provide, including "health services and personal counseling" and further required "students must have access to confidential counselling and health services."  Standards for the Accreditation of Medical Schools, CAAM-HP (Revised 2017), p. 5.  The purpose of that mandate for accreditation is to ensure the accredited University has sufficient facilities to provide counseling services to "promote the well-being of students" and "facilitate[s] their adjustments to the physical and emotional demands of medical school and the professional practice that they will enter."  Id.

16. Despite holding itself out as meeting the accreditation requirements of CAAM-HP, AUA provided no personal counseling services for students during the relevant time period while

4

Emily was a student.  On information and belief, AUA does not qualify for accreditation through CAAM-HP because of its failure to provide basic counseling services as required by the accreditation mandate.

17.  Included among the relevant section of the documents which form the current effective contract between Emily and AUA are the following provisions:

### STUDENT HANDBOOK, FALL 2020

    a.  <u>Clinical Sciences</u>:  Students are expected to be in attendance at all times during all clinical rotations. . . the fact is, emergency situations do come up.  Students must obtain permission to be excused for a brief period of time from a rotation in advance from their preceptors. . . Otherwise, it will appear that the student has abandoned a rotation. . . Students . . . taking an unauthorized absence during clerkship rotations may be dismissed from the clerkship and receive a failing grade. Students will incur the cost of any cancellation fees . . .  Please refer to the AUA Clinical Rotation Guidelines for further details.

(Student Handbook Fall 2020, pp. 49-50).

18.  Further in the Student Handbook Fall 2020, students are advised that "missing class… for an appointment at the student health center… will <u>not</u> warrant a medical excuse."  Student Handbook Fall 2020, p. 120.  While this section of the Student Handbook Fall 2020 appears to address only attendance at "an exam, lab, group activity, or more than 2 days' absence from lectures," there is no express limitation of the prohibition on a medical excuse for routine lab work only prior to the beginning of clinical rotations.  Moreover, the limited exceptions provided for medical excuses set forth on p. 120, and which may not be applicable to clinical rotations, is as severely restricted as the Clinical Sciences portion of the Student Handbook Fall 2020 and the Clinical Rotation Guidelines for September 2020.

19.  Emily sought to include in her required rotations one or more rotations in internal medicine, emergency medicine, anesthesia, endocrinology, critical care intensive care and family

medicine. She sought to do so at Grand Strand Hospital in Myrtle Beach ("Grand Strand") or the Medical University of South Carolina (MUSC).

20. Because neither facility was then affiliated with AUA for clinical rotation purposes. Emily submitted a non-affiliated hospital clerkship request to her clinical coordinator at AUA, to seek a contract for clinical rotations for herself and perhaps others at both Grand Strand and MUSC.

21. On information and belief, in February 2020, AUA and/or Manipal contracted with Grand Strand through Hospital Corporation of America for AUA to become affiliated with Grand Strand for purposes of allowing AUA students to perform clinical rotations at that facility.

22. Emily applied for clinical rotations at Grand Strand in February 2020, and was accepted for clinical rotations in both Internal Medicine and Anesthesia to begin in August, 2020.

23. As required by the AUA Clinical Rotation Guidelines, Emily completed and submitted to Grand Strand the required documentation for her scheduled rotation at Grand Strand in March 2020, including a 10-panel drug screen taken on February 24, 2020.

24. On May 13, 2020, AUA through its agent Manipal notified Grand Strand that Emily was in good standing and qualified for the rotations which began on August 3, 2020.

25. Upon acceptance of the Grand Strand rotations, Emily signed the Workforce Member Confidentiality and Security Agreement for her rotations at Grand Strand Medical Center, finalizing the documentation submission for her rotations at Grand Strand.

26. Emily's rotation at Grand Strand Medical Center was governed by, *inter alia,* the Clinical Clerkship Duty Hours Policy contained in the AUA Clinical Rotations Guidelines. Included

among the guidelines was a mandate for duty hours not to exceed 80 hours per week, inclusive of all in-house call activities and a mandatory one day free of duty every week.

27. Rather than providing the accreditation-required counseling services for students to deal with stress during rotations, AUA merely included the following general statement in its AUA Clinical Rotation Guidelines: "Decision fatigue is a term that is used to describe the reduced quality of thinking that occurs after making too many decisions in a row.  After a certain point, people tend to follow the path of least resistance and put less thought into their decisions.  Research indicates that this can have a significant impact on legal and other kinds of decisions." *Id.* at p. 21.

28. On information and belief, this mere reference to the existence of the possibility of decision fatigue is a far cry from compliance with the accreditation requirement for "confidential counselling and health services," the unavailability of which was a material deviation from the duties owed to Emily by Defendants.

29. Emily began her internal medicine anesthesia rotations at Grand Strand on August 3, 2020, with a scheduled completion date of September 25, 2020.

30. On August 10, 2020 Emily paid, and AUA accepted, a tuition payment for Fall 2020 for Clinical Sciences 8th Semester Weeks 64-84 in the amount of $28,850.00.  This represented the tuition for Emily's remaining rotations for her medical degree from AUA.

31. On August 24, 2020, the document specialist assigned to Emily sent her an email which said, *inter alia,* "[p]lease be sure all your documentation is up to date for your 10/05.20 rotation… all updates will need to be submitted no later than 09/02/2020."

32.  Emily had not used any drugs that would have caused her to fail a drug screen.  However, she was prohibited by the AUA Clinical Rotation Guidelines Attendance Policy from requesting time off during a scheduled duty day to obtain the drug screen: "Attendance Policy:  100% attendance is required during ALL clinical rotations.  Unapproved absences will result in a failing grade for a rotation (F). . . only absences in care of medical (doctor's note required) or family emergencies (documentation required) or extra-curricular activities (*i.e.,* conference attendance, residency interview might be granted."

33.  Additionally, the Grand Strand rotation guidelines to which Emily was obligated to arrive ready to work at 6:00 a.m. and usually she was required to work a 12-hour day.

34.  The email of August 24, 2020 was received on a Monday (time does not appear on the email).  The deadline imposed by the email was nine (9) days later, only one day of which was a day that Emily was not scheduled to be present during her rotation.  During her only scheduled time off, local labs which offered the required urine test were not open.

35.  Because AUA did not provide any counseling services, Emily had no mental health resources available to her to consult regarding an impossible situation: twelve-hour workdays covering six days a week, and all local independent labs operating on limited hours likely due to Covid-19 while prohibited by her contract with AUA from requesting time off to visit the lab during the hours when drug screens were available.  Emily made a bad decision.  She knew a current drug screen would be negative, so she submitted an altered copy of a prior negative drug screen of her own with an updated date to the document specialist at AUA.

36.  On August 28, 2020, Emily was unexpectedly allowed to conclude her workday during the morning hours.  Taking advantage of that unexpected opportunity, Emily immediately went to an independent drug lab and obtained a full 10-panel urine drug screen and submitted it to

her document specialist.  As were all previous drug screens Emily submitted, this screen was negative for any prohibited substances.  Emily provided the August 28, 2020 drug screen to AUA on August 28, 2020, well within the required deadline for submitting the required documentation.

37.  AUA instituted an honor code investigation against Emily on September 3, 2020.  By that time, Emily had already communicated with relevant authorities within AUA including a faculty adviser and advised them exactly what had occurred and pointed out that, in addition to the altered prior drug screen, that she had provided an unaltered, required 10-panel *negative* urine screen on August 28, 2020, well before the deadline to do so, and asked for consideration in light of her exigent circumstances.

38.  AUA instituted a grievance proceeding against Emily and at a hearing on September 21, 2020 allowed her as well as one witness to testify in her support.   AUA prohibited Emily from having the advice or presence of legal counsel.

39.  On information and belief, AUA failed to record or document the hearing verbatim.  In addition, AUA did not provide Emily with a report generated by the hearing committee.  She eventually received a copy of the report when the Executive Dean contacted her on September 28, 2020 to notify her that she was being dismissed as a student from AUA.

40.  On September 28, 2020, Emily was advised that the Professional Standards Committee had made a recommendation that was accepted by the Executive Dean for Clinical Services, and declaring that the Executive Dean had determined Emily was dismissed from AUA.

41.  Following notice of her dismissal, Emily followed the appeal process as set forth in the student handbook and other documents which form the basis of the contract between herself

and the defendants.  On October 2, 2020, she filed a Notice of Appeal with AUA, and a written brief an appeal followed on October 16, 2020.  She requested that the sanction be reduced from a dismissal and that she be allowed to complete her medical degree.

42.   Emily was allowed to complete her scheduled rotations.  After her August rotation, she completed a four-week rotation for anesthesia from August 28, 2020 to September 25, 2020, and another rotation in Diagnostic Radiology from October 5, 2020 to October 303,2020, and an online radiology program from Florida International University from November 23, 2020 through December 18, 2020.

43.   There was no opposition filed by anyone to Emily's request via the internal AUA appeal process for a reduced sanction.

44.   On December 2, 2020, the President of AUA sent an email which states that "the legal papers provided by your attorney… are both factually and legally incorrect.  However, I have not attributed the factual inconsistencies to you.  I am therefore upholding the determination of guilt.  I am modifying the penalty from a dismissal to a six-month suspension.  The suspension shall begin immediately upon completion of your present rotation which ends on December 18, 2020."

45.   Through her counsel, Emily requested the imposition of the suspension be timed so as to allow her to continue to continue to participate in the National Resident Matching Program[2] for March 2021, for which AUA had already registered and recommended Emily.

---

[2]  The National Resident Matching Program is a contractual arrangement between participating and eligible medical schools to provide a "system for the confidential selection f applicants to graduate medical education programs… to provide applicants the opportunity to make informed decisions about the medical specialty or specific training program they seek to enter and to provide training programs to make informed assessments about applicants in an orderly manner and without pressure.  (Match Participation Agreement for Medical Schools for the 2021 Main Residency Match®).

46. AUA had previously certified Emily's eligibility to participate in the March 2021 Match program by submission in October 2020, well after the events upon which AUA later relied for imposing her dismissal from school.

47. The Decision of the President to impose a six-month suspension in lieu of a dismissal from school, but to also deprive Emily of her pre-existing contractual right to participate in the March 2021 MATCH program that AUA had continued until that point to facilitate,[3] constitutes a bad faith breach of the contractual provisions for the student disciplinary process and serves as an unnecessarily severe penalty for Emily, whose difficulty arose because Defendants failed to have sufficient student counseling available to assist her when Defendants imposed unreasonable requirements upon her, in breach of her agreement with Defendants.

48. Emily has already been interviewing with top academic institutions for residency programs to begin upon her graduation from AUA in July 2021.  On information and belief, Defendants' breach of contract has, at minimum, caused Emily to lose a full year toward completing her medical school education and transitioning into residency.  It may well have cost her the entire value of her medical education if Defendants' multiple breaches of contract operate to prohibit her from completing her medical education at AUA or another academic institution with equal or higher standing than AUA.

---

[3] Emily's partition in the 2021 MATCH program for matching her application for residency with medical institutions with which she had interviewed had vested in October, 2020.  She has not been provided with any documentation withdrawing her from the MATCH program, but she is informed and believes that AUA has notified one or more institutions of the imposition of a sanction against her.

49. Defendants failed to comply with the terms of their contract with Emily as well as the terms of the student disciplinary process as required by the contract between the parties in multiple respects as set forth below.

50. Emily has been a model student, as evidenced by the October 13, 2020 Medical Student Performance Evaluation done by the Executive Dean for Clinical Sciences, previously submitted for the 2021 MATCH, a redacted copy of which is attached hereto as **Exhibit A.**

51. Emily has upheld her obligations under the contract between the parties and has shown herself to be an outstanding student. Additionally, she has met all financial obligations imposed upon her for completion of a medical degree upon her under the terms set forth in the contract between the parties, which payments for tuition exceed payments to AUA in excess of $200,000.00.

52. On information and belief, Defendants conduct by breach of contract has proximately resulted in multiple damages to Emily financially, emotional, professionally, and personally, which damages are not presently capable of precise calculation.

**FIRST CAUSE OF ACTION**
(Breach of Contract)

53. Each and every allegation set forth above is incorporated herein where relevant, as fully as if repeated herein verbatim.

54. Defendants failed in numerous respects to comply with its obligations with respect to Emily, including the grievance procedure set forth in the Student Handbook Fall 2020, thereby breaching its contract with Emily, causing proximate damages as a result to her, including financial damages for the costs expended for her education at AUA, associated costs for

attending classes and rotations, the loss of her earned credits for completed courses and tests, as well as her reputation and her future.

55. Medical schools accredited[4] by the CAAM-HP, such as AUA, are required by the accreditation standards to provide Academic and Career Counselling for students and confidential counseling services for assisting students dealing with the unusual pressure and obligations of medical school. On information and belief, by holding itself out as an accredited school, AUA has incorporated the requirements of the CAAM-HP accreditation standards as part of the contract between the parties, including provision of meaningful confidential counseling services.

56. AUA has violated the accreditation standards of CAAM-HP by not having the mandatory personal counselling services required by CAAM-HP[5]. The counselling program under

---

[4]  Accreditation of medical schools is not required but is highly sought.  "A school applies for accreditation in part surely for reputational purposes but also because it "'wants[s] a key that would unlock the federal Treasury.'"  *Bosch v. NorthShore University Health System*, 2019 Il App 1st 19070, No. 1-19-0070 (December 11, 2019) * 7, quoting *Sojourner-Douglass College v. Middle States Ass'n of Colleges & Schools*, No. ELH-15-01926, 2015 WL 5091994, at *42-43 (E. Md. August 27, 2015), quoting *Chicago School of Automatic Transmissions Inc. v. Accreditation Alliance of Career Schools & Colleges,* 44 F.2d 447, 449 (7th Cir. 1994).  "An accrediting body, . . . is . . . 'a proxy for the federal department whose spigot it opens and closes.'"  *Id.*, citing *Chicago School*, 44 F.3d at 449.  It matters not that an accrediting agency may alter the terms to which a private school must adhere during the period of accreditation, because "[i]t can change its standards at any time, unilaterally.  It can change its accreditation decision regarding a particular school at will, too."  *Id.*

[5]  The Student Handbook, p. 119, advises that "mental health counseling services" are available for "any personal issue" but provides no offer of confidential services as mandated by CAAM-HP to "promote the well-being of students" or "facilitate[] their adjustment to the physical and emotional demands of medical school and the professional practice they will enter."  The examples provided of "personal" issues for which a student may consult with "[o]ur clinicians" are described as "the more challenging aspects of the human experience, including but not limited to… alcohol and drug-related issues… anxiety and stress management… sexuality and gender issues."  Student Handbook Fall 2020, p. 119.  While the Handbook provides that any "personal issue" may be "confidentially discussed… [with] our clinicians…" it makes no guarantee that the issues discussed will in any way be insulated from a student's academic or career progression. Indeed, by providing only the University's own clinicians for counseling on "personal issues" the University makes clear there is no truly confidential counseling available.  By utilizing only the University's own clinicians, a student cannot be assured her academic record will not be tainted by her decision to discuss her "personal" issues with the University's own clinicians.

CAAM-HP is required is separate from any academic evaluation or promotion of students and is required to be <u>confidential.</u>**[6]**.

57. Defendants failed to provide all aspects of the curriculum and student resources required by the by the "Caribbean Accreditation Authority for Education In Medicine and Other Health Professions" (as Revised 2017) and therefore failed to provide the curriculum for which Emily contracted, violating AUA's contract with Emily.

58. Defendants violated AUA's contractual obligations to Emily, including the disciplinary procedures as set forth in the Student Handbook Fall 2020 in the following incidents, all of which proximately resulted in damages to Emily, including loss of her financial investment in her training at AUA, her reputation and her future:

   a. When it failed to provide Emily with a copy of the Report of the hearing panel of the Professional Standards Committee of the University prior to its submission to the Executive Dean;

   b. By disciplining Emily based on an "honor code" that does not exist;

   c. By failing to require findings of fact from the hearing panel;

   d. By failing to consider the burden of proof required by the prescribed discipline process as set forth in the Student Handbook Fall 2020;

   e. By allowing the decision of the hearing panel to be influenced by outside concerns, including "implications for… AUA students who may later wish to rotate at the same

---

[6]  AUA does, in fact, document the existence of an <u>academic</u> advising program, *see p.* 46, Student Handbook, Fall 2020, but not the required "confidential counseling and health services. . . to promote the well-being of students…" <u>Standards</u> CAAM-HP (Revised 2017), p. 5.  Its actions toward Emily therefore, exhibit a deviation from its required accreditation standards, which is a term of the contract upon which Emily relied when she enrolled at AUA.

medical facility, the university and even on Dr. H… who had previously written a letter of recommendation" for Emily;

f.  By the report of the Executive Dean of Clinical Services, which claimed to rely upon his review of "findings" of the hearing panel when there were no factual findings in the report of the hearing panel;

g.  By the Decision Executive Dean of Clinical Services, which misstated the report of the hearing panel in numerous respects, including the deprivation of a right to counsel; and

h.  In denying Emily fundamental fairness throughout the disciplinary proceeding.

59.  AUA specifically violated its contract with Emily when it failed to comply with the student grievance process prescribed by the contract between the parties and denied Emily of fundamental fairness as follows:

a.  Considered matters irrelevant to the issues before it, *i.e.,* the school's own reputation and what the sponsoring hospital might think if the University did <u>not</u> dismiss Emily from school,

b.  Failed to record or archive the hearing before the hearing panel which occurred on September 21, 2020, depriving Emily the opportunity to adequately address omissions in the proceedings or to point out portions of the record in her Appeal.

c.  By permitting the hearing panel to consider unsworn and unverified witness statements as evidence. This failure to comply with standards of reasonableness constituted a breach of contract between Emily and the University.

d.  AUA made no effort to follow the discipline process spelled out in the Student Handbook Fall 2020.  Neither the Panel Report nor the Executive Dean's decision refer

to any provision of the Student Handbook Fall 2020 or the Clinical Rotation Guidelines, nor do they follow the prescribed procedures for discipline.  At no point during the proceedings leading up to the Executive Dean's decision to dismiss Emily from the University has there been a reference to the mandates set forth in the Student Handbook Fall 2020 or the Clinical Rotation Guidelines for September 2020.

e.  The Student Handbook Fall 2020 provides the contracted-for terms upon which the University may rely to dismiss a student from the program.  "Students are subject to dismissal[7] under the following circumstances… "   The only circumstance set forth in the Student Handbook relevant as a basis for dismissal as a sanction under these facts is "non-academic reasons or professionalism concerns pursuant to AUA's code of conduct."  Student Handbook Fall 2020, p. 91.

f.  Oddly, the Student Handbook Fall 2020 does not contain a "code of conduct."  It does, however, contain a section entitled <u>Student Conduct and Discipline – Student Grievances</u> which contains a paragraph on "professional conduct and ethical behavior." (Student Handbook Fall 2020, pp. 97-98.   One of the items under the <u>Student Conduct and Discipline</u> section provides that "professional conduct and ethical behavior include but are not limited to. . . the honest and authentic execution of all responsibilities and the submission of all educational and clinical work without misrepresentation nor falsification."  Student Handbook Fall 2020, p. 97.  The reference to "clinical" work is ambiguous and there is a serious question about whether the reference to "clinical"

---

[7]  Dismissal is defined by the Student Handbook as "full termination of the student's enrollment at the university." (Student Handbook Fall 2020, p. 91).

work in the <u>Student Conduct and Discipline</u> section is related to a student's own documentation, or whether it relates to patient care during a rotation.

g.  The Student Handbook Fall 2020 requires only certain immunizations (measles, mumps, rubella (MMR), VaaricellaIcG Antibody Quantitative Titer, Hepatitis B, tetanus and diptheria, and purified protein derivative test (PPD), flu shot) for admission and attendance, but does not require a 10-panel urine drug screen at any point prior to clinical rotations.  *See* Student Handbook Fall 2020, pp. 145-147.  The requirement for obtaining 10-panel drug urine screen is contained only as part of documentation requirements for clinical rotations as set forth in the Clinical Rotation Guidelines, a portion of the contract between the parties for which no consideration was provided and therefore is unenforceable.

h.  At no point during the proceedings which led to the decision by the Executive Dean to dismiss Emily from school was any portion of the Student Handbook Fall 2020 or the Clinical Rotation Guidelines cited.  In other words, the entire disciplinary proceeding has been conducted with total disregard for the terms of the contract between Emily and the University.

i.  No complaint or charges were ever served on Emily.  Emily was notified via email on September 3, 2020 that an investigation was taking place by the Professional Standards Committee.   (Trial exhibit dated 9.3.2020).  Emily was contacted by Dr. Vernon Lindsey on September 12, 2020, who reported to the Professional Standards Committee that Emily has been allowed to "remedy the infraction by complying with the drug screening at a local clinic."  (Trial exhibit dated 9.12.2020).

j. The "Appointed Member" was required to "draft charges… which shall set forth… the nature of the violation and the essential acts and/or failures to act that the Committee will offer in support of the charges."  Student Handbook Fall 2020, p. 102, ¶ b.  <u>That did not occur</u>.

k. The Student Handbook requires, in advance of the hearing, "the presentation of the charges to the accused student(s) together with a list of witnesses that the Committee expects to call upon to provide testimony and evidence at the hearing and all evidence gathered by the Dean of Student Affairs, Committee and the Appointed Member that is relevant to the matter to be determined at the hearing whether or not such evidence would tend to support or defeat the charges…"  <u>That did not occur.</u>

m. Most significantly, the exhibits provided to counsel for Emily do <u>not</u> contain the August 28, 2020 10-panel drug screen which verified the negative drug screen results that were provided to AUA on August 28, 2020.  That led to speculation during the deliberations of the hearing panel "the possibility that the test report was falsified because the results may not all have been negative at that time.  <u>This, however, can never be verified."</u> Panel Hearing Report p. 4.

n. The hearing panel report demonstrates clearly that the hearing panel was <u>not</u> provided with a copy of the actual 10-panel drug screen test that occurred on August 28, 2020 and was submitted to AUA on that same date, nor did the apparently abbreviated recitation of the witness statements which were read aloud even reference the negative drug screen of August 28, 2020.[8]

---

[8]  Several of the "exhibits" identified in the report of the hearing panel make reference to the August 28, 2020 drug test and its negative results, suggesting that the hearing panel members did not bother to read the written evidence that

o. The Student Handbook Fall 2020 requires that the hearing panel "shall render a written statement as to whether the charges… have been sustained by the greater weight of the evidence presented at the hearing." *Id.* p. 105.

p. The hearing panel report makes no finding of fact. The "charge" is stated as "forgery" when, in fact, Emily was never served with charges of any kind and nothing in the contract documents permits the University to proceed to adjudicate a matter without the service of charges consistent with the documents which form the contract between the parties. It does not appear witnesses were sworn and instead an "Appointed Member" was permitted to read some/all portions of unsworn documents which contained hearsay into the record.[9] Rather than being sworn and presenting testimony, Dr. Sanii "reiterated his account (as stated in the relevant evidentiary document)."

q. If the hearing panel members were aware of the burden of proof as "greater weight of the evidence" they ignored it and certainly did not include it in their report. The report contains a list of persons present, a "summary of statements made by the Appointed Member and the AUA Witness," a list of "evidence" submitted, a "summary of statements made by the Accused Student and her Witness," stated "the following was gleaned…" by the hearing panel members and ended with "Miscellaneous notes" before beginning "Hearing Panel Deliberations." (Panel Report dated September 24, 2020.

---

was submitted and/or that the portions of the exhibits that were read aloud did not include references to the negative drug screen. Even if the August 28, 2020 10-panel urine drug screen had been introduced, the speculative report of the hearing panel suggests it would not have been read.

[9] As noted, there is no "record" of the hearing proceedings.

r.   Emily was not aware of the hearing panel report nor was she provided with a copy of it, until she retained counsel.   Her first knowledge of the report came with the letter of September 28, 2020.

s.   The hearing panel made no consideration of the August 28, 2020 negative drug test (which was referred to in the exhibits but not introduced into evidence for consideration by the hearing panel).   The August 28, 2020 drug test was never considered by the hearing panel, leading to the clearly erroneous conclusion of the hearing panel that Emily's lack of drug use was something that "can never been verified" when in fact, the exhibits clearly referred to it.

t.    The contract prohibits the hearing panel from considering matters that are not "relevant to the issues at hand."   Student Handbook Fall 2020, p. 104.   However, the hearing panel's deliberations wandered far afield when the hearing panel considered the effect "the implications for . . . AUA students who may later wish to rotate at the same medical facility, the university and even on Dr. H . . . who had previously written a letter of recommendation" for Emily.

u.   It is inescapable that the hearing panel allowed its concern for the University and the reputation of a particular faculty member to skew its deliberations; clearly the panel was convinced that the University's own reputation and that of its faculty member obviated in favor of a particularly harsh result in Emily's case.   In terms of fundamental fairness, nothing could be more damaging to Emily than putting the University's own interests above hers during unbiased deliberations.   This, combined with the failure of

the hearing panel to know about the negative drug test submitted on August 28, 2020[10] (even when it was referenced in the exhibits) demonstrates clearly the inappropriate deliberations which led to the panel report.

v.  Also during deliberations, the practicing physician on the hearing panel found it "inconceivable… that an Attending would frown upon or not give permission for his/her subordinate to take time off to submit a sample for drug screening."  Hearing Panel Report p. 4, bullet 2, suggesting that the practicing physician on the hearing panel was not even aware of the prohibitions imposed on Emily by the contract between the parties.  As discussed in detail above, the documents which governed Emily's conduct during her rotation on the one hand discouraged, and on the other hand affirmatively prohibited Emily from seeking time off during a rotation for anything other than an emergency.    Logically, it _does_ seem odd that an Attending would not consider such a request, but Emily was prohibited by her contract with the University from even _making_ the request to the Attending.  The failure of the practicing physician on the hearing panel from knowing what terms governed Emily's conduct during her rotation certainly should have prohibited consideration of such speculation by the hearing panel. It did not.

w.  In speculating that "drug screening was noted to be a normal part of life for health care workers, including for physicians every time they need to renew their license", the hearing panel did not bother to research what renewal requirements for physicians exist in any jurisdiction.  Again, the deliberations wandered into speculation.  Even the

---

[10]  By concluding that Emily's drug status "can never be verified" the hearing panel included speculation that Emily may have been attempting to hide the results of a then-current drug screen, when nothing could be further from the truth.  The issue was Emily's poor judgment in submitting what she believed to be a routine (and accurate) drug test.

University's own requirements for admission did not include a drug screen, which became a requirement only in advance of a rotation as a result of unilaterally-issued rotation guidelines without consideration which sought to be imposed as amended contract terms.

x.  The hearing panel also speculated that Emily's "choice to falsify the document" could have been the "start or the continuation of a pattern" clearly evidences the hearing panel had no information regarding Emily's unblemished record during her academic and clinical years at the University.  In such a vacuum, the hearing panel was left to struggle with such unanswered questions and to focus instead on the "strong statement about the need for honesty" that needed to be made in this instance.  Again, the hearing panel was considering the University's own reputation rather than the circumstances of Emily's individual case[11].

y.  The hearing panel's reference to Emily's father's statements as a "non sequitur" suggest the hearing panel discounted the testimony by Emily's father without making any analysis or findings as to the credibility of Emily's credibility as a witness.  This error is magnified by the University's own failure to adhere to the accreditation requirement to provide mental health or counseling for students who face difficult decisions or coping mechanisms during their education, leaving Emily to lean on her father for advice, since the University offered none.

---

[11]  Emily obtained a hair follicle test on October 1, 2020 to confirm that a test taken at any time prior to the August 28, 2020 10-panel urine drug screen would have been negative.  However, she was not allowed to present this evidence as part of her appeal.

z.   The Dean's letter of September 28, 2020 continues to deviate from the required standards set forth in the documents which form the basis of the contract of the parties, although it certainly appears that the defects in the proceedings of the Professional Standards Committee gave him a distorted and insufficient record from which to work.

aa.  The Dean's letter fails to accurately state the record, which was insufficient for the Dean to make a meaningful review of the "report" from the report of the Professional Standards Committee.  The Dean's decision of September 28, 2020 was uninformed and should have been reversed on appeal.  Emily respectfully requested the President to vacate the decision of the Dean and impose a more appropriate (and private) sanction[12], consistent with the contract between Emily and the University, and that would have enabled Emily to continue her medical education at AUA and graduate on the schedule for which she contracted and for which she would still be eligible but for the multiple breach of contract set forth herein.

bb.  The Dean's letter obviously did not consider the failure of AUA to provide Emily and other students with the counseling and mental health services mandated by the CAAM-HP accreditation.  As a result, no consideration was made by the Dean or the President of mitigation based on the University's own failures to provide a meaningful and much needed resource for students who are facing difficult decisions during the most stressful part of their medical education.

---

[12] "Discipline may include but may not necessarily be limited to probation, suspension, dismissal from the school, receipt of a failing grade… on specified course work, failure of a class… withdrawal from a class… or enforced leave of absence.  Any discipline may also include a suspension of any discipline or such other conditions as the hearing panel may determine are appropriate under the circumstances."  Student Handbook Fall 2020, p. 105.

cc. The inadequacy of the Dean's and the Presidents conclusions is further evidenced by numerous statements that are not supported by the record and misstate the applicable documents. the Dean's letter said it was, *inter alia*, to "advise you of the findings of the Professional Standards Committee." However, there were no findings made by the Professional Standards Committee. There was a report which evidenced the hearing panel's unfamiliarity with the contract documents, the evidence and its repeated efforts to place AUA's interests and a faculty member's own reputation as the key factor in its deliberations.

dd. The Dean's letter said he considered only the "report" from the committee and made no reference to the exhibits that were introduced. It seems logical the Dean did not have the exhibits, or at least did not review them, because the Dean made no reference to the negative drug screen provided by Emily to Dr. S. . ., which was provided to AUA well before the deadline set on August 24, 2020. To the extent AUA willfully withheld the August 28, 2020 drug screen result from the record before the hearing panel, that also violates the contract between the parties in that it deviates from the doctrine of good faith and fair dealing inherent in every contract.

ee. The Dean stated that the allegations against Emily that she had violated the "AUA honor code" and that she violated the AUA student honor code of conduct" and referenced the "students' honor code. There is no "code of conduct" in the contract documents. Emily has been disciplined by AUA on the basis of standards which are not applicable (and may not even exist) and are not a part of the contract between the parties.

ff. The Dean's decision was based upon his agreement "with the Committee's findings." The Committee did not make any findings, as pointed out above.

60. As a direct and proximate result of AUA's numerous breach of its contract with Emily, Emily has sustained significant multiple damages to Emily financially, emotional, professionally and personally, which damages are not presently capable of precise calculation.

61. Emily prays for a determination that Defendant has breached its contract with Emily in numerous respects and award her damages in an amount to be determined by the trier of fact.

## SECOND CAUSE OF ACTION
(Unfair Trade Practices)

62. Each and every allegation set forth above is incorporated herein where relevant as fully as if repeated herein verbatim.

63. Based on the acts and omissions of the Defendant set forth herein, Defendant has engaged in unfair methods of competition and unfair or deceptive acts in the conduct of their trade and commerce.

64. The unfair trade practices of the Defendant complained of herein are not subject to regulation by laws administered by this State or the United States, and are private rights contracted for independently by the parties.

65. Defendant has proximately caused Emily ascertainable loss of money and property as a result of its use of unfair, deceptive methods, acts or practices prohibited by the South Carolina Unfair Trade Practices Act (hereafter "the Act").

66. On information and belief, Defendant's actions in violation of the Act were willful and knowing violation of the Act, which entitle Emily to recover three times her actual damage

sustained, as well as equitable relief which in this case should include a full refund of all monies paid to AUA by or on behalf of Emily and an order prohibiting Defendant from engaging in future violations of the Act.

67. In addition to the damages and equitable relief sought herein, Emily is informed and believes she is entitled to recover attorney's fees and costs pursuant to the Act.

WHEREFORE, having fully set forth the grounds for relief sought, Emily prays for an order establishing a scheduling order for litigation of this matter, and entry of judgment in her favor against Defendant for:

A. Actual and consequential damages, including damages for emotional distress and loss of reputational damages, in an amount to be determined by the trier of fact based on Defendant's breach of contract.

B. Determining the amount of damages Emily has sustained by virtue of the Defendant's unfair trade practices as described herein.

C. An order trebling the actual damages Emily has sustained by virtue of the reckless nature of Defendant's actions and omissions; and

D. An aware of attorney's fees and costs in an amount determined at the conclusion of these proceedings.

Respectfully submitted,

s/ Desa Ballard
Desa Ballard (ID# 1179)
Harvey M. Watson III (ID# 9271)

**BALLARD & WATSON**
226 State Street
West Columbia, SC  29169

Telephone 803.796.9299
Facsimile 803.796.1066
desab@desaballard.com
harvey@desaballard.com

ATTORNEYS FOR PLAINTIFF

December 23, 2020